UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JASON BEGIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | JURY DEMANDED |
| LAURA DROUIN and the CITY OF | ) | |
| AUGUSTA, MAINE | ) | |
| | ) | |
| Defendants, | ) | |

## **COMPLAINT**

NOW COMES plaintiff Jason Begin, by and through undersigned counsel, and hereby complains against Defendants as follows.

### **The Parties**

1.      At all times material to this action, plaintiff Jason Begin ("Mr. Begin") was a resident of the City of Augusta, Kennebec County, Maine.

2.      Defendant the City of Augusta, Maine (hereafter the "City") is a municipality located in Kennebec County, Maine.

3.      At all times material to this complaint defendant Laura Drouin (hereafter "Officer Drouin") was acting in the course and scope of her employment with the City in her official capacity as a police officer for the City.

**Jurisdiction and Venue; Jury**

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue lies in the United States District Court for the District of Maine sitting at Bangor pursuant to 28 U.S.C. § 1391(b)(1) & (2) and Local Rule 3(b).

6.      Trial by jury is demanded.

**Background Facts**

7.      From approximately August of 2004 to January of 2014, Mr. Begin was a patient at, and resided at, Riverview Psychiatric Center in Augusta, Maine ("RPC").

8.      In January of 2014 Mr. Begin began a modified release from RPC and was permitted to physically leave RPC and to reside at an apartment complex located on Green Street in Augusta, Maine.

9.      Although Mr. Begin was on a modified release from RPC, he remained in the custody of the Maine Department of Health and Human Services.

10.     Mr. Begin resided at the Green Street apartment until January 12, 2015.

11.     As of January 12, 2015, Mr. Begin was working for Access Worldwide in Augusta, where he assisted customers on the phone who were having trouble with their AT&T service.

12.     Mr. Begin was scheduled to go to work at 1 pm on January 12, 2015.

13.     On the morning of January 12, 2015, RPC's Assertive Community Treatment ("ACT") Team summonsed Mr. Begin to come to its office, which is located in the Ballard Building on East Chestnut Street in Augusta, Maine.

14.     Philip Hunt, a mental health worker who assists clients at the Green Street Apartments and who was familiar with Mr. Begin, drove Mr. Begin to the ACT Team's office on the morning of January 12, 2015.

15.     When Mr. Begin arrived at the ACT Team's office, members of the ACT Team interrogated him and repeatedly asked him why he thought the meeting had been called.

16.     Mr. Begin told the ACT Team that he thought the meeting was called because the ACT Team may have mistakenly believed he had missed a particular Alcoholics Anonymous meeting.

17.     Mr. Begin explained to the ACT Team that he in fact went to the Alcoholics Anonymous meeting.

18.     An ACT Team member then asked Mr. Begin if he knew of any other reason why the meeting had been called, and he informed Mr. Begin that he had the opportunity to be transparent with the team because someone had accused Mr. Begin of something.

19.     Mr. Begin could not think of anything that he had done wrong, and he told the ACT Team members that he had been transparent with them.

20.     The ACT Team then told Mr. Begin that someone had accused Mr. Begin of giving him a small amount of marijuana and of using marijuana himself.

21.     Mr. Begin repeatedly denied using marijuana or supplying it to anyone else.

22.     In support of his denial of either using or supplying marijuana, Mr. Begin referenced the many clean drug tests he had taken during his modified release.

23.     The ACT Team had in its file for Mr. Begin the results of many drug tests, all of which indicated that Mr. Begin had not used drugs.

24.      During the ACT Team members' questioning of him, Mr. Begin asked for his lawyer to be present, and he verbally expressed to the ACT Team that he was being accused of something he did not do.

25.     Mr. Begin offered to take a polygraph exam concerning whether he had used marijuana or given it to anyone.

26.     The ACT Team did not identify to Mr. Begin the person who had made the accusations against him, and it asked Mr. Begin who he thought may have made the accusation.

27.     After discussing the accusations concerning marijuana for approximately 45 minutes, the ACT Team asked Mr. Begin to leave the room and go to the waiting area of the ACT Team's offices while the team members discussed the matter further among themselves.

4

28.     Mr. Begin waited in the waiting area for approximately ten minutes with Phillip Hunt and then was called back in to speak with the ACT Team again.

29.     During the second conversation, the ACT Team told Mr. Begin that he could go to work as scheduled that day but that it was going to search his room at the Green Street Apartments.

30.     Mr. Begin told the ACT Team that he wished to be present while they searched his room.

31.     Mr. Begin subsequently started to leave the building to return to his apartment at Green Street.

32.     An ACT Team member stopped Mr. Begin from leaving and told him that he could not leave the building and would need to stay and wait until an ACT Team member could go with him to Green Street and search his room.

33.     Mr. Begin then waited for over two hours in the waiting room of the ACT Team's offices while the ACT Team members met amongst themselves.

34.     During the time it met outside Mr. Begin's presence, the ACT Team made the decision that it would return Mr. Begin to RPC.

35.     After the ACT Team made the decision to return Mr. Begin to RPC, Gregory Smith, a member of the ACT Team, called the Augusta Police Department to request transport of Mr. Begin back to RPC.

5

36.     On information and belief, in response to Gregory Smith's request, the Augusta Police Department assigned Officer Drouin to go to the ACT Team office.

37.     Officer Drouin was the only officer assigned to go to the ACT Team office in response to Gregory Smith's request.

38.     Officer Drouin was not familiar with Mr. Begin prior to being assigned to go to the ACT Team office.

39.     Officer Drouin met Gregory Smith at the Ballard Building on January 12, 2015, and they took the elevator to the second floor of the facility, where Mr. Begin was sitting in the waiting room.

40.     Officer Drouin arrived at the ACT Team office before the ACT Team informed Mr. Begin of its decision to return him to RPC.

41.     After Officer Drouin and Gregory Smith exited the elevator on the second floor of the Ballard building, Officer Drouin was asked to stand just in front of the elevator doors in the hallway while ACT Team members spoke with Mr. Begin about the plan to take him back to RPC

42.     While Officer Drouin waited in the hallway near the elevators, two members of the ACT Team conveyed to Mr. Begin the ACT Team's decision to return him to RPC.

43.     The conversation in which the ACT Team informed Mr. Begin that he was being returned to RPC took place in the waiting area of the ACT Team's offices, where Mr. Begin had sat for over two hours.

44.     Officer Drouin could hear some, but not all, of the conversation between the ACT Team and Mr. Begin because there was a large volume of unrelated radio traffic on her portable radio.

45.     Mr. Begin repeatedly told the ACT Team that he did not want to return to RPC.

46.     After being informed that he would have to return to RPC, Mr. Begin repeatedly stated, "I didn't do anything wrong."

47.     In response to Mr. Begin saying, "I'm not going back to the hospital," a member of the RPC ACT Team told Mr. Begin, "At this point you don't have a choice," and he informed Mr. Begin that they had a police escort present to bring him back to RPC.

48.     When Mr. Begin understood that he had no choice but to return to RPC after having lived outside the facility for a year, he stood up.

49.     When Mr. Begin stood up, one or more members of the ACT Team asked Officer Drouin, who was still just outside the waiting area, to come into the waiting area.

50.     After he stood up, Mr. Begin took a pocket knife out of one of his pockets, stated, "I should have done this moons ago," and cut himself on his left bicep.

51.     Mr. Begin made no verbal threat to any other individual at any time during his interactions with the ACT Team on January 12, 2015.

52.     Mr. Begin did not make any aggressive movements towards Officer Drouin or towards any of the others in the area after producing his knife.

53.     Approximately five seconds after he cut himself with his pocket knife, Officer Drouin fired three shots at Mr. Begin with her duty handgun, a .40 caliber Glock model 23.

54.     Mr. Begin was hit by all three bullets: one punctured a lung, one hit him in his left shoulder after narrowly missing his head, and another hit his lower left chest and shattered his ribs.

55.     No one, including Officer Drouin, told Mr. Begin to drop his knife at any time before he was shot.

56.     No one uttered the word "stop" to Mr. Begin before he was shot.

57.     At all times material to this complaint, Officer Drouin was armed with a Taser.

58.     Officer Drouin did not use her Taser on Mr. Begin.

59.     Mr. Begin did not pose a threat of imminent bodily injury to any other person at the time he was shot by Officer Drouin.

60.     Mr. Begin was not under arrest at the time he was shot by Officer Drouin.

61.     Mr. Begin committed no crime on January 12, 2015.

8

62.     After she shot Mr. Begin, Officer Drouin handcuffed him.

63.     Mr. Begin drifted in and out of consciousness after he was shot and was subsequently taken by ambulance to MaineGeneral Hospital, where he remained until February 27, 2015.

64.     After being discharged from MaineGeneral Hospital, Mr. Begin was returned to RPC.

## Count I
## (42 U.S.C. § 1983—Officer Drouin)

65.     Mr. Begin repeats the allegations in Paragraphs 1 through 64 as if fully set forth herein.

66.     Mr. Begin had a clearly established right under the Fourth and Fourteenth Amendments to the United States Constitution not to be shot by Officer Drouin.

67.     At all material times, Officer Drouin was acting under color of a statute, ordinance, regulation, custom, or usage of the State of Maine.

68.     Officer Drouin's shooting of Mr. Begin was an excessive use of force.

69.     A reasonable police officer in Officer Drouin's position would have understood that she was violating Mr. Begin's Fourth and Fourteenth Amendment rights.

70.     Officer Drouin's conduct was so deficient that no reasonable police officer could have made the decision to shoot Mr. Begin under the circumstances.

71.     As a direct a proximate result of Officer Drouin shooting him, Mr. Begin was deprived of rights, privileges and immunities secured by the United States Constitution, and he sustained life-threatening and permanent injuries (including partial paralysis and scarring), emotional distress, and loss of enjoyment of life.

WHEREFORE plaintiff Jason Begin prays that this Honorable Court grant judgment in his favor against defendant Laura Drouin in an amount that is just and reasonable, including an award of attorney's fees pursuant to 42 U.S.C. § 1988, and award him any further relief it deems just and proper.

## Count II
### (Battery—Officer Drouin)

72.     Mr. Begin repeats the allegations in Paragraphs 1 through 64 as if fully set forth herein.

73.     Officer Drouin's actions on or about January 12, 2015 were unwelcome and unprovoked.

74.     Mr. Begin did not consent to being shot by Officer Drouin.

75.     Officer Drouin intended to cause harmful or offensive contact to Mr. Begin.

76.     As a direct and proximate result of Officer Drouin shooting him, Mr. Begin sustained life-threatening and permanent injuries (including partial paralysis and scarring), emotional distress, and loss of enjoyment of life.

10

77.     All prerequisites to the maintenance of this claim set forth in 14 M.R.S. § 8101 et seq. have been satisfied or have occurred.

WHEREFORE, plaintiff Jason Begin demands judgment against defendant Laura Drouin in an amount that is just and reasonable, and he further demands any such other and further relief as this Court deems just, proper and equitable.

### Count III
### (Negligence—Officer Drouin)

78.     Mr. Begin repeats the allegations in Paragraphs 1 through 64 as if fully set forth herein.

79.     Officer Drouin owed a duty to Mr. Begin to exercise reasonable care in the execution of her duties as a police officer.

80.     Officer Drouin breached her duty to Mr. Begin by using deadly force against him in lieu of taking any other form of action.

81.     As a direct a proximate result of Officer Drouin's breach of duty, Mr. Begin sustained life-threatening and permanent injuries (including partial paralysis and scarring), emotional distress, and loss of enjoyment of life.

82.     All prerequisites to the maintenance of this claim set forth in 14 M.R.S. § 8101 et seq. have been satisfied or have occurred.

WHEREFORE, plaintiff Jason Begin demands judgment against defendant Laura Drouin in an amount that is just and reasonable, and he further demands any such other and further relief as this Court deems just, proper and equitable.

### Count IV
### (Vicarious Liability—the City)

83.     Mr. Begin repeats the allegations in Paragraphs 1 through 64 and 78 through 82 as if fully set forth herein.

84.     The City is vicariously liable for Officer Drouin's negligence.

85.     All prerequisites to the maintenance of this claim set forth in 14 M.R.S. § 8101 et seq. have been satisfied or have occurred.

WHEREFORE, plaintiff Jason Begin demands judgment against defendant City of Augusta, Maine in an amount that is just and reasonable, and he further demands any such other and further relief as this Court deems just, proper and equitable.

Dated at Brunswick, Maine, this 16th day of February, 2016.

/s/ Bradford A. Pattershall
Law Office of Bradford A. Pattershall, LLC
18 Pleasant St., Ste. 202
Brunswick, ME 04011
Telephone: (207) 373-9309
brad@law207.com

/s/ Matthew D. Bowe
Law Office of Matthew D. Bowe
18 Pleasant St., Ste. 107
Brunswick, ME 04011
Telephone: (207) 373-9314
mattbowelaw@gmail.com

*Attorneys for Plaintiff*

13