UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JASON BEGIN, | ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | 1:16-cv-00092-JCN |
| LAURA DROUIN, et al., | ) ) ) | |
| Defendants | ) | |

# MEMORANDUM OF DECISION ON
# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff Jason Begin alleges that Defendant Laura Drouin, an officer with Defendant City of Augusta's Police Department, used excessive force against him when she shot and injured him on January 12, 2015. Plaintiff also asserts state law claims, including a vicarious liability negligence claim against the City of Augusta.

The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 23.) Through the motion, Defendants argue that Defendant Drouin's use of force was reasonable, that any debate as to the reasonableness of the force used is insufficient to overcome qualified immunity, that state law immunity doctrines shield Defendant Drouin from liability on the state tort claims, and that the City of Augusta is immune on Plaintiff's vicarious liability claim. (*Id.*)

Following a review of the record, and after consideration of the parties' arguments, the Court grants in part and denies in part the motion.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party, a trial worthy controversy exists and summary judgment must be denied. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).

## II. SUMMARY JUDGMENT FACTS [1]

Prior to January 2015, Plaintiff had a history of mental illness and treatment, including inpatient treatment at Riverview Psychiatric Center in Augusta (Riverview) for over nine years. (Plaintiff's Statement of Additional Material Facts (PSAMF) ¶¶ 75 – 76, ECF No. 25.) On August 2, 2004, Plaintiff was found not criminally responsible by reason

---

[1] The facts set forth herein are derived from the parties' Local Rule 56 statements of material facts and the parties' stipulation.

of insanity on a felony theft charge and a misdemeanor violation of conditions of release charge. (Stipulation ¶ 1, ECF No. 20.) Based on the finding, the Superior Court committed Plaintiff to the custody of the Commissioner of the Department of Behavioral and Developmental Services, and Plaintiff was subsequently placed in Riverview. (*Id.* ¶¶ 2 – 3.)

On or about October 3, 2013, the Superior Court granted Plaintiff a modified release, which permitted him to leave Riverview subject to certain conditions. (*Id.* ¶ 5.) Pursuant to the modified release order, Plaintiff was required to reside in a group residential program. (*Id.* ¶ 6.) In January 2014, Plaintiff was released from Riverview and began residing in a group residential program. (*Id.* ¶ 7.)

On January 12, 2015, members of Riverview's Assertive Community Treatment Team (the ACT Team) met with Plaintiff at their office in Augusta; the purpose of the meeting was to inform Plaintiff that the ACT Team had information which suggested he was in violation of the terms of his community placement. (Stipulation ¶¶ 14, 23.) After an initial discussion with Plaintiff, the ACT Team determined they would recommit Plaintiff. (*Id.* ¶¶ 26, 29.) The ACT Team anticipated that Plaintiff would be upset by the news, and called the Augusta Police Department to request the presence of an officer when the ACT Team informed Plaintiff of the decision. (*Id.* ¶¶ 30, 32; PSAMF ¶¶ 62, 64.)

Defendant Drouin was dispatched to the office, where she met Greg Smith, a member of the ACT Team. (PSAMF ¶ 56.) Mr. Smith informed Defendant Drouin that Plaintiff was to be recommitted to Riverview and that Plaintiff might become

uncooperative.[2] (*Id.* ¶ 62; Stipulation ¶ 39.)  Mr. Smith was the only member of the ACT Team with whom Defendant Drouin spoke when she arrived at the ACT Team office. (PSAMF ¶ 59.)  When Defendant Drouin asked Mr. Smith if Plaintiff had a history of violence, Mr. Smith answered yes, but did not elaborate further. (*Id.* ¶ 40.)

Prior to speaking with Mr. Smith, Defendant Drouin was aware of Plaintiff's name and that she would be escorting him to Riverview.  She had no prior knowledge about Plaintiff.  (*Id.* ¶¶ 43 – 44, 50; Stipulation ¶ 38.)  Defendant Drouin had been to Riverview previously, and understood that Riverview was a locked psychiatric hospital.  (PSAMF ¶ 52.)

Defendant Drouin entered the building with Mr. Smith, and waited out of view while the ACT Team delivered the news to Plaintiff.  (Defendants' Statement of Material Facts (DSMF) ¶ 1, ECF No. 24.)  Defendant Drouin waited and listened in a hallway adjacent to the relatively small room in which Plaintiff received the news.  (Photographs of scene, ECF Nos. 21-15, 21-16, 21-17, 21-18, 21-19, 21-20.)  While she waited in the hallway of the ACT Team offices, Defendant Drouin could hear some, but not all, of the conversation between the ACT Team and Plaintiff.  (Stipulation ¶ 42.)

During the meeting, Russell Kimball, a member of the ACT Team, told Plaintiff that he would be returning to Riverview.  (Stipulation ¶ 49.)  Several other members of the team stood or sat nearby, with at least three of the members standing in the short, narrow entry to the office space.  (*Id.* ¶¶ 45, 47, 48.)  In response to the news, Plaintiff stated that

---

[2] Defendant Drouin did not learn from dispatch the reason for the recommitment.  (PSAMF ¶ 60.)  Mr. Smith explained briefly to Defendant Drouin the reason for her presence.  (*Id*. ¶ 61.)

4

he was not going back to Riverview. (*Id.* ¶ 50; DSMF ¶ 2.) Mr. Kimball told Plaintiff the decision was made, and Brian Charette, another member of the ACT Team, informed Plaintiff that he had no choice in the matter and that a police officer was present to take him to Riverview. (Stipulation ¶ 52; DSMF ¶ 3.) A member of the ACT Team then motioned to Defendant Drouin to approach, which she did. (Stipulation ¶ 53.)

As she approached, Defendant Drouin saw a man seated in a chair along the wall to her right, and then saw Plaintiff seated in one of the two chairs against the opposite wall.[3] (Stipulation ¶ 54; Photo, ECF No. 21-18.) Plaintiff stood up and, as he stood, reached into his pocket and said, "I should have done this moons ago." (Stipulation ¶ 55; DSMF ¶ 4.) When Plaintiff raised his right arm to approximately shoulder height, Defendant Drouin saw that Plaintiff had a black folding knife in his hand that he quickly snapped into the open position. (Stipulation ¶¶ 56 – 57; DSMF ¶ 13.)

When Plaintiff stood up, Philip Hunt, a mental health worker who was employed by Motivational Services and who transported Plaintiff from his group home to the ACT Team's office, was the closest to Plaintiff. (Stipulation ¶¶ 15, 58.) Mr. Hunt did not make any movements toward Plaintiff, and backed out of the way when he observed Defendant Drouin approach. (*Id.* ¶ 59.)

Based on Plaintiff's statement that he was not returning to Riverview, and his sudden display of a knife he had concealed in his clothing, Defendant Drouin feared

---

[3] In her answers to interrogatories, Defendant Drouin stated that Plaintiff was seated when he first came into her view. (PSAMF ¶ 65, citing ECF No. 21-22, PageID # 317.)

Plaintiff would use the knife against the ACT team members or her.[4] (DSMF ¶ 15.) When Plaintiff raised the knife in his right hand, ACT Team members were in close proximity to Plaintiff and Defendant Drouin. (*Id.* ¶ 16.) There was no one between Defendant Drouin and Plaintiff. (Plaintiff's Opposing Statement of Material Facts ¶¶ 16, 19, ECF No. 25.)

Defendant Drouin drew her firearm. As she did, she observed Plaintiff slash his arms with the knife. (DSMF ¶¶ 17, 30.) Because Plaintiff inflicted severe wounds to himself without any hesitation, Defendant Drouin feared he would not hesitate to use his knife on her or the ACT Team members who were near him. (*Id.* ¶ 18.) Defendant Drouin determined that if she did not disable Plaintiff with her firearm, Plaintiff could very quickly use his knife against someone other than himself. (*Id.* ¶¶ 20, 27, 31.)

Approximately one second after Plaintiff pulled out his knife and opened it, as she was drawing her firearm, Defendant Drouin yelled "hey, hey, hey" at Plaintiff. (*Id.* ¶ 21.) Defendant Drouin gave Mr. Begin no verbal commands. (PSAMF ¶ 70.) She then fired three shots, striking Plaintiff twice in the chest and once in the left shoulder; she stopped shooting when Plaintiff fell to the floor. (*Id.* ¶¶ 22, 23; Stipulation ¶ 60.)

According to Defendant Drouin, the approximate distance between Defendant and Plaintiff was 15 to 20 feet. (PSAMF ¶ 72.) Defendant Drouin estimates that the time from when she first saw Plaintiff to the time she discharged her weapon was approximately four to six seconds. (Stipulation ¶ 64.) Before discharging her weapon, Defendant Drouin did

---

[4] At her deposition, Defendant Drouin testified that she saw Plaintiff withdraw a knife, open it at approximately the level of his head, and use it to cut his arm(s). (Drouin Dep. at 24 – 27.)

not see Plaintiff take any steps toward anyone else after he stood up and took the knife from his pocket. (PSAMF ¶ 69.) Plaintiff remained stationary. (*Id*.)

Defendant Drouin was certified to use an expandable baton and a Taser, and had each available to her. (Stipulation ¶ 68.) She also had OC spray. (*Id*.) Defendant Drouin did not use the OC spray, baton or Taser against Plaintiff. (*Id.* ¶ 69.) Defendant Drouin was not attempting to arrest Plaintiff when she shot him. (*Id.* ¶ 70.)

Defendant Drouin was a member of the Augusta Police Department's Crisis Intervention Team (CIT). To become a member of the CIT, Defendant Drouin received training and education as to the ways to communicate effectively with and otherwise manage individuals with mental health issues. (Stipulation ¶¶ 71 – 73.) She also received related training at the Maine Criminal Justice Academy. (*Id.* ¶ 74.) Although the Augusta Police Department's computer files contained information about Plaintiff, including that caution should be used when interacting with him because he is suicidal,[5] Defendant Drouin was unaware of the information at the time because she did not access the information before she arrived at the ACT Team offices. (PSAMF ¶¶ 45, 46, 51.)

Mr. Charette, a vocational rehabilitation specialist, Mr. Hunt, a mental health worker, and Mr. Kimball, a physician's assistant, believed Plaintiff's actions were unpredictable.[6] (DSMF ¶¶ 32 – 36.) Mr. Kimball, in particular, believed that Plaintiff might use the knife against anyone who tried to stop him. (*Id.* ¶ 37.)

---

[5] The information also includes a description of Plaintiff and states that he was "released from Riverview." (PSAMF ¶¶ 47 – 48.)

[6] Plaintiff objects to Defendants' statements regarding the impressions of others present at the time because their subjective interpretation of events was unknowable to Defendant Drouin. Additionally, Mr. Hunt

7

The Augusta Police Department had in place Standard Operation Procedures for "Situational Use of Force" (the Use of Force SOP) (ECF No. 21-12), in effect on January 12, 2015. (Stipulation ¶ 76.) The Use of Force SOP provides: "It is the policy of [the Department] that an officer's responsibility is to use only that amount of physical force that reasonably appears necessary to affect an arrest, control a situation, or to defend the officer or a third party from harm." (ECF No. 21-12, § I.) Thus, "an officer may use only that physical force that the officer reasonably and actually believes is necessary to effectively bring an incident under control while protecting the officer and another, including the use of an electronic weapon and less-than-lethal munitions, if applicable." (*Id.* § I.C.)

The Use of Force SOP explains that the appropriate use of force is "situational." (ECF No. 21-12, § III.S.) It defines situational use of force as follows:

> A dynamic process by which an officer assesses, plans, and responds to situations that threaten public and officer safety. The assessment process begins with the situation immediately confronting the officer, and moves to the suspect's behavior and the officer's perceptions and tactical considerations. Based on this assessment, the officer selects from the available response options while continuing to evaluate the evolving situation and adapt a plan and actions that are reasonable and effective for the particular situation.

(*Id.*) Pursuant to the SOP, deadly force is justified when the officer "reasonably believes such force is necessary … [f]or self-defense or to defend a third person from what the officer reasonably believes is the imminent use of unlawful deadly force." (*Id.*

---

testified that he did not feel concerned for his own safety, and none of the people present testified that Plaintiff ever made a move toward another person. Plaintiff's objections are credited as qualifications.

§ VII.B.1.a.)[7] The SOP defines "imminent" as "[i]mpending, immediate or appearing as if about to happen." (*Id.* § III.K.) The continuum of force set forth in the SOP is as follows:

> A. Officer Presence: Officers in uniform or officers identifying themselves as police officers are the lowest form of force used in the continuum of force.
>
> B. Verbal Commands: The use of verbal directions to control or dictate an individual's actions.
>
> C. Passive Control: Light, physical touching to guide a subject's movements and overcome low levels of resistance.
>
> D. Compliance Techniques: Actual, physical bodily contact with a subject and forcibly controlling a subject until resistance is overcome. This includes control and defensive tactics, striking a subject with your body, using OC spray, using electronic control devices or taking a subject to the ground. These tactics are the use of non-deadly force.
>
> E. Defensive Tactics: The use of impact weapons to gain compliance and control. This also includes the pointing of a firearm at a person.
>
> F. Deadly Force: Force that may cause death or serious bodily injury including; the dispatch of a firearm or the delivery of a stroke or blow to a subject's head.

(*Id.* § IV.)

### III.  SUMMARY JUDGMENT ANALYSIS

**A.  Section 1983 – Excessive Force**

Defendants contend they are entitled to summary judgment because the undisputed facts demonstrate that Plaintiff cannot establish that, under the circumstances, Defendant Drouin's conduct was objectively unreasonable. Alternatively, Defendants argue that even

---

[7] *See also* 17-A M.R.S. § 107 (physical force in law enforcement).

if a factual issue exists as to the reasonableness of Defendant Drouin's conduct, summary judgment is warranted based on the qualified immunity doctrine.

Pursuant to the federal civil rights statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To maintain a claim under section 1983, a plaintiff must establish: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999).

### 1. *Objective reasonableness*

Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (some internal quotation marks omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Relevant factors for consideration include "the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (the so-called *Graham* factors).[8]

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* A court's assessment must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396 – 97. The test is an objective test: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

To assess the "objective reasonableness" of Defendant Drouin's conduct, the Court must consider the conduct in light of the *Graham* factors. First, while Plaintiff's conduct was not necessarily criminal, the conduct was nevertheless serious. Given that Defendant Drouin was present because the ACT Team believed Plaintiff might react in a way that would require police assistance, and given the nature of Plaintiff's conduct upon receipt of the news that he was returning to Riverview, Defendant Drouin's intervention was understandable. The severity or seriousness of Plaintiff's conduct, however, does not end

---

[8] *See also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (listing the following non-exhaustive factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting"). The *Graham* factors are listed in the definition of excessive force supplied in the Augusta Police Department's Use of Force SOP. (ECF No. 21-12, § III.I.)

the reasonableness analysis. The facts and circumstances also include Defendant Drouin's knowledge that Plaintiff could react emotionally to the news he was to receive, the fact Plaintiff did not make a threatening move or gesture to any other person, and the fact that other than yelling "hey, hey, hey," Defendant Drouin did not provide Plaintiff with a warning or directive before she discharged her firearm. The second *Graham* factor (i.e., whether Plaintiff posed an immediate threat to the safety of the officers or others), therefore, is, in this case, an important consideration.

On this record, viewing the evidence most favorably to Plaintiff, a fact finder could reasonably conclude that Plaintiff did not make a move toward any other person when he displayed the knife,[9] that the person closest to Plaintiff in the room (Philip Hunt) backed away as Defendant Drouin approached, that Plaintiff made no verbal threats to any of the individuals in the room, that Plaintiff did not refuse to comply with any commands made by Defendant Drouin, and, therefore, that Plaintiff did not pose an immediate threat to Defendant Drouin and the others who were present.

---

[9] In their statement of material facts, Defendants assert that Plaintiff pointed the knife in Mr. Kimball's direction before and after Plaintiff slashed himself. (DSMF ¶ 35.) At his deposition, Mr. Kimball testified as follows:

> He made no lunges at me. He didn't waive it threateningly. He didn't do anything with that knife, but immediately upon opening it this arm went up like that and … the knife immediately went down like that across close to the antecubital area on his left arm.

(Kimball Dep. at 37 – 38, ECF No. 21-4.) After Plaintiff slashed himself, the knife, which he held in his right hand, was pointed in Mr. Kimball's "general direction." (*Id.* at 38.) Based on the testimony, a fact finder could conclude that given Plaintiff's location in relation to Mr. Kimball and because Plaintiff was holding the knife in his right hand, the knife was oriented in Mr. Kimball's general direction, but Plaintiff made no move or gesture suggesting an intention to use the knife on anyone other than himself.

The third *Graham* factor asks whether the person actively resisted arrest or attempted to evade arrest by flight. A fact finder could conclude that before discharging her firearm, Defendant Drouin did not give Plaintiff any verbal commands. Although Defendants contend Plaintiff's statement that he was not going back to Riverview is material to the resistance issue, under the circumstances presented in this case, the significance of the statement would be for the fact finder to assess.

A review of the *Graham* factors and the record thus reveals that while Plaintiff plainly posed a threat to himself,[10] disputed material factual issues, including whether Plaintiff presented an immediate threat to Defendant Drouin or others in the room, preclude the entry of summary judgment based on the objective reasonableness of the conduct.

### 2. *Qualified immunity*

Government officers are entitled to qualified immunity unless they violate a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights

---

[10] In *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), the Ninth Circuit, when assessing the second *Graham* factor in a case involving suicidal behavior, observed that "*Graham* does not specifically identify as a relevant factor whether the suspect poses a threat to *himself*." *Id.* at 872 (emphasis in original). The court assumed proper intervention could include "some reasonable level of force to try to prevent … a suicidal act," but also stated that it was "aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide." *Id.* (emphasis in original).

13

are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992)).

Defendant Drouin's assertion of qualified immunity requires the Court to assess: (1) "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation" and (2) "whether the violated right was clearly established at the time that the offending conduct occurred." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014). When the Court considers whether the constitutional right was clearly established at the time, the Court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Id.*

The constitutional prohibition against the use of excessive force has long been clearly established. *See, e.g.*, *Morelli*, 552 F.3d 12, 23 – 24 (1st Cir. 2009) (describing the law in this area as "crystal clear"). The qualified immunity analysis, however, requires a consideration of the particularized facts of the case, not broad general propositions. *Hunt*, 773 F.3d at 368. Thus, "the relevant question is not whether the Fourth Amendment generally prohibited excessive force." *Id.* "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal

14

doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). "To be clearly established, the contours of this right must have been 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[I]mmunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (citation and internal quotation marks omitted).

The issue in this case is whether at the time of the incident, the law was clearly established such that Defendant Drouin would have understood that she was violating Plaintiff's rights when she used deadly force without any warning or directive to Plaintiff, as Plaintiff was inflicting harm to himself with a knife with other people in the same room, but where Plaintiff made no verbal threats to or threatening moves toward Defendant Drouin or the others who were in the room. Decisions of the Supreme Court, circuit courts, including the First Circuit,[11] and this Court, clearly established, before Defendant Drouin's encounter with Plaintiff in January 2015, that use of deadly force by a law enforcement

---

[11] While "'the salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional,'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)), Plaintiff is not required to identify a First Circuit case with the same or similar facts to provide notice to Defendants of Plaintiff's rights. *McCue v. City of Bangor, Maine*, 838 F.3d 55, 64 (1st Cir. 2016) ("We have also looked to the case law of sister circuits in determining whether a right was clearly established."); *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011) ("Even without a First Circuit case presenting the same set of facts, defendants would have had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive.").

officer is reserved for circumstances where a subject presents an immediate threat to the safety of the officer or others, and where the officer, when feasible, has provided the subject with a warning or instruction to cease the threatening conduct, but the subject persists in the conduct.

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court, assessing the use of deadly force to stop a person fleeing the scene of a burglary, wrote:

> *[I]f the suspect threatens the officer with a weapon* or there is probable cause to believe that he has committed a crime involving the infliction of serious physical harm, deadly force may be used if necessary to prevent escape, *and if, where feasible, some warning has been given.*

471 U.S. at 11 – 12 (emphasis supplied).

The Tenth Circuit, when identifying several "non-exclusive" factors relevant to the assessment of the degree of the threat, reinforced the need for the threat to be immediate, and the significance of a command, when feasible, to a suspect to drop a weapon before deadly force is used. *See Estate of Larsen ex rel. Surdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008). The court identified the following factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id*. at 1260.[12] Similarly, the Ninth Circuit determined, "officers may not shoot

---

[12] Relying in part on *Larsen*, the court in *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015), upheld the denial of a summary judgment motion based on qualified immunity where the trial court determined that a law enforcement officer shot an intoxicated individual with mental health issues who had threatened suicide, was holding a knife by his thigh, made no threatening gestures, and had not refused to drop the knife because he had not been given sufficient time to drop it.

16

to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others," and, "whenever practicable, a warning must be given before deadly force is employed." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (citing *Garner*, 471 U.S. at 11 – 12).

First Circuit precedent suggests that whether a verbal warning or instruction was feasible and given are important considerations even when assessing the reasonableness of the use of non-deadly, but serious force. In *Parker v. Gerrish*, 547 F.3d 1 (1st Cir. 2008), the First Circuit affirmed a jury verdict for a plaintiff who was shot with a Taser where the record could support findings that the plaintiff made no threatening move and did not resist arrest. *Id.* at 5, 11. When distinguishing a case, *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), in which summary judgment was entered in favor of the defendant where a law enforcement officer used a Taser to subdue the plaintiff, the Court noted that in *Draper*, among other factors, the plaintiff repeatedly refused to comply with the officer's verbal directives. *Parker*, 547 F.3d at 11.[13]

---

[13] First Circuit precedent also instructs that excessive force claims involving persons with mental illness generally follow the same analysis as claims involving suspects apprehended for criminal conduct. *See, e.g.*, *Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001) ("[T]he state's duty to protect those it confines because of mental illness requires that force be used as sparingly as possible."). Depending on its assessment of the circumstances, a finder of fact could regard mental illness as a factor that reduces the governmental interest in applying force. *See, e.g.*, *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995); *Herrera v. Las Vegas Metro. Police Dep't*, 298 F. Supp. 2d 1043, 1051 (D. Nev. 2004). For instance, the Augusta Police Department SOP for Responses to Behavior of Person in Mental Health Crisis emphasizes as a priority the need "to de-escalate a subject in mental health crisis." (ECF No. 21-11, § VII.E.)

A review of relevant case law thus reveals that at the time of the 2015 incident involving Plaintiff and Defendant Drouin, the contours of the constitutional protection from the use of excessive force were sufficiently clear such that a reasonable law enforcement officer would have understood that when a subject displays and uses a knife[14] to inflict self-harm in the presence of others, the use of deadly force is reasonable only when there is an immediate threat of harm to the officer or the others, and only after, if feasible, the officer provides a warning or instruction to the subject and the subject persists in threatening conduct. In short, this legal principle was not "at a level of generality so high that officials [could not] fairly anticipate the legal consequences of specific action." *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003) (en banc).

Here, when viewed most favorably to Plaintiff, the record could support the following findings: (1) within a few seconds of entering the room in which Plaintiff was meeting with members of the ACT Team, Defendant Drouin shouted "hey, hey, hey" and shot Plaintiff three times; (2) as Defendant Drouin approached, the person in the room closest to Plaintiff backed out of the way, and there was no one between Defendant Drouin and Plaintiff; (3) prior to discharging her weapon, Defendant Drouin did not instruct Plaintiff to drop the knife or otherwise warn him of the possible use of deadly force; and

---

[14] The presence of a potentially dangerous weapon, such as a knife, is but a factor in assessing the immediacy of any threat. This point was reinforced by the Tenth Circuit in *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005). The court vacated the grant of summary judgment on the issue of qualified immunity where a law enforcement officer used deadly force (a "Sage Launcher") against the plaintiff, who was distraught, holding a knife pointed at his heart, but had not made a threatening move toward police, was not actively resisting arrest, and arguably did not have time to comply with the police order to drop the knife.

18

(4) before Defendant Drouin discharged her weapon, Plaintiff made no movement toward any other person and made no verbal threats to any other person. Given the findings that are supportable when the record is viewed most favorably to Plaintiff, whether Plaintiff posed an immediate threat to Defendant Drouin or others, and whether a warning or instruction to Plaintiff was feasible under the circumstances are material factual issues in dispute.[15] Accordingly, Defendants are not entitled to summary judgment based on qualified immunity.[16]

**B.    State Law Immunity Doctrines**

In addition to his civil rights claim, Plaintiff alleges that Defendant Drouin is liable in tort (negligence and battery), and that the City of Augusta is vicariously liable for the harm caused by Defendant Drouin. Defendants argue that state law immunity doctrines preclude a recovery.

*1.    Personal immunity for governmental employees*

Defendant Drouin contends that she is immune from Plaintiff's tort claim under the Maine Tort Claims Act, 14 M.R.S. § 8111(1)(C), (E). (Motion at 11 – 15.) Because the

---

[15] To the extent Defendants contend that the "hey, hey, hey" Defendant Drouin yelled at Plaintiff just before she discharged her weapon constitutes a command to stop, whether the directive was a command to stop and, if so, whether Plaintiff had the opportunity to stop between the time of Defendant Drouin's statement and the discharge of her weapon, are factual issues for the fact finder to decide.

[16] The facts of this case are in contrast to the facts in *Norton v. City of South Portland*, 831 F. Supp. 2d 340, 365 – 64 (D. Me. 2011), where this Court determined that qualified immunity applied. In *Norton*, law enforcement shot and killed an individual with mental health issues who had threatened suicide, who exited a home carrying two knives after a four-hour standoff with law enforcement, was approximately 15 to 20 feet from a law enforcement officer, and was continuing to move toward the officer, after having been instructed to drop the knives. In other words, in *Norton*, law enforcement were confronted with an immediate threat to their safety (i.e., subject was coming toward them with two knives in his hands) and a subject who refused to drop the weapon upon law enforcement's command to do so.

record generates a genuine factual issue as to whether Defendant Drouin applied excessive force, Defendant Drouin is not entitled to summary judgment under the Maine Tort Claims Act. *Cote v. Town of Millinocket*, 901 F. Supp. 2d 200, 248 (D. Me. 2012); *Blackstone v. Quirino*, 309 F. Supp. 2d 117, 130 (D. Me. 2004); *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281, 292.

### 2. *Municipal immunity*

Municipal immunity is absolute under the Maine Tort Claims Act, subject only to limited exceptions. 14 M.R.S. §§ 8103, 8104-A, 8116. Based on the undisputed facts, including the scope of the City of Augusta's liability insurance coverage,[17] none of the limited exceptions to sovereign immunity applies and the City is entitled to summary judgment on Plaintiff's vicarious liability tort claim.

## IV. CONCLUSION

Based on the foregoing analysis, the Court grants in part and denies in part Defendants' Motion for Summary Judgment. (ECF No. 23.) The Court grants Defendants' motion as to Plaintiff's claim against the City of Augusta (Count IV) and enters judgment in favor of the City of Augusta. The Court denies Defendants' motion as to Plaintiff's claim of excessive force and Plaintiff's related tort claims (Counts I – III).

SO ORDERED.

/s/ John C. Nivison
Dated this 20th day of April, 2017.       U.S. Magistrate Judge

---

[17] Aff. of William Bridgeo, ECF No. 21-2; Me. Mun. Assoc. Prop. & Cas. Pool Coverage Cert., ECF No. 21-3.